7022

### CHEEK v. SEABOARD AIR LINE RY.

1. CHARGE—ASSUMPTION OF RISKS.—Illustrations in charge as to assumption of risks by crew on one train of cars of negligence of crew on another train was not misleading.

2. IBID.—RAILROADS.—It was not error here to refuse to construe in the charge the rules of the railroad company, put in evidence as to duty of protecting trains between or at stations, as they do not apply to the facts in this case.

Before GARY, J., Abbeville, October, 1907.    Affirmed.

Action by J. A. Cheek against Seaboard Air Line Railway. From judgment for defendant, plaintiff appeals.

*Mr. Wm. N. Graydon,* for appellant, cites: *Duty of Court to construe rules in evidence:* Hughes on Inst. to Juries, secs. 156, 163; 121 Ind., 594; 104 N. Y., 155; 43 Ill., 420; 36 S. C., 294; 42 S. C., 67; 38 S. C., 420; 69 S. C., 421.

*Messrs. J. L. Glenn* and *Wm. P. Greene,* contra. *Mr. Greene* cites: *Attention of Court should be called to error in stating issues:* 62 S. C., 563; 65 S. C., 38. *A request partly erroneous may be refused:* 63 S. C., 489.

*Mr. Glenn* cites: *As to charging jury on the facts:* 47 S. C., 489; 59 S. C., 37; 62 S. C., 546; 52 S. C., 438.

September 21, 1908. The opinion of the Court was delivered by

MR. JUSTICE WOODS. This action for personal injuries was tried at the October, 1907, term of the Court of Common Pleas for Abbeville county, and resulted in a verdict for defendant.

A brief statement of the testimony on behalf of the plaintiff is necessary to the consideration of the appeal. Freight train No. 20, in charge of the plaintiff as conductor, was about to end its trip at Greenwood and was within the yard limits, moving, under full control, at the rate of four or five miles an hour. The approach through the yard is slightly up-grade, requiring the engineer, as the plaintiff expressed it, "to work steam to go into the yard." The plaintiff testified, as he started to get down from the cupola of the cab, a very sudden and unusual stop threw him to the floor, inflicting serious injury. T. S. Calhoun, the yardmaster, testified the train was stopped by a white light signal, because another freight train, No. 21, was approaching the main line from a sidetrack. When both trains had been

stopped by the signal they were from twenty to thirty car
lengths apart. This witness further testified that train No.
21 had not reached the main track when train No. 20 came
into the yard. On cross-examination the witness said there
was no duty to protect by flagging within the yard limits,
and that one in charge of an incoming train would there
expect to be stopped at any time. Eli Hinson, the fireman
of train No. 20, who was sworn for plaintiff, said he was
on the engine, looking out for signals in front; saw train
No. 21 approaching the main line, but could not tell whether
it had reached it; signal was given by white light, and engi-
neer, in response, shut off steam and stopped the train; he
could not tell whether·engineer used brakes at all, but was
sure he did not use emergency brakes. In answering the
question whether the engineer stopped the train suddenly,
the witness said: "Pretty suddenly; he didn't come right
plang down at it; he stopped pretty sudden, though." In
plaintiff's report of the accident to the company these ques-
tions and answers are found: "If any violation of rules
caused accident, give same by number. None." "Did
engineman and other trainmen use care in the handling of
train at time accident occurred, or if any other than train-
men injured; was equipment handled properly? Yes."

It was, of course, conceded the plaintiff could not recover
for any negligence of the engineer on his train, and the case
rests on the allegation that the rules of the defendant com-
pany required the conductor, or person in charge of train
No. 21, to send out a flagman to warn train 20 that train
21 was on the main track.

These were the rules relied on to sustain this position:

"Rule 391. A train not having right of track must be
entirely clear of the main track by the time it is required by
rule to clear an opposing train or a train running in the same
direction; failing to do so, it must be immediately protected,
as provided in Rule No. 399.

"Rule 399. When a train stops, or is delayed under circumstances in which it may be overtaken by a following train, the flagman must go back immediately, with danger signals, a sufficient distance to insure full protection. When recalled he may return to his train, first placing two torpedoes on the rail when the conditions require it. The front of the train must be protected in the same way, when necessary, by the fireman.

"a. When a train is detained at any of its usual stops more than five minutes, or stops at an unusual place, where the rear of the train can be plainly seen from a train moving in the same direction at a distance of at least fifteen telegraph poles, the flagman must go back, with danger signals, *not* less than two telegraph poles and as much farther as necessary to protect his train; but if the rear of his train cannot be plainly seen at a distance of at least fifteen telegraph poles, the flagman must go back not less than fifteen telegraph poles and put down one torpedo, and continue to a point thirty telegraph poles from the rear of his train and place two torpedoes on the right hand rail (looking toward his train) two rail lengths apart; he must then return to the point where first torpedo was placed and remain there until called in, when he will take up the one torpedo, and if the weather is foggy, raining, or if it is night, he will leave a fusee burning.

"b. A flagman going ahead of a train to stop an opposing train must not depend upon a flag or lamp alone to stop such train, but must place one torpedo on left hand rail when train is approaching and proceed toward coming train, placing other torpedoes at intervals of five telegraph poles until signal is recognized, and in foggy or rainy weather, or at night, place a fusee.

"c. When a train in motion is losing time, fusees must be lighted and thrown off to protect its rear against trains moving in the same direction, unless there be an unob-

structed view of at least twenty telegraph poles or more. This by day as well as by night.

"Rule Q. All freight trains will approach all stations, water tanks and coaling stations between stations under control, and so proceed until the track is seen to be clear. The responsibility at stations, coaling stations or water tanks between stations will rest with the following or incoming train. This will not relieve trainmen or engineman from responsibility of protecting trains at stations, as provided in Rules 391 and 399."

The appeal depends on alleged errors in the charge to the jury. At plaintiff's request the following instruction was given: "That while an employee of a railroad company assumes the ordinary risks incident to his employment, he does not assume the risk of the negligence of employees on another train of cars, or engaged in another department of labor." We think the illustration used in commenting on the request, that a train crew in Greenwood is not held to assume the risk of negligence of a crew in Columbia, could not have been regarded by the jury as anything more than an illustration, and could not have been understood as an instruction that the plaintiff assumed the risk of the negligence of the crews on other trains, unless they were at a different place.

The other exceptions relate to alleged errors of the Circuit Judge in not construing the rules of the company in his charge to the jury; in not charging that if the plaintiff was injured through disregard of the rules by the crew of another train, the defendant would be liable; and in not charging: "That under Rules 391, 399, and under Rule 'Q,' it was the duty of the conductor of No. 21 to have sent out a flagman or fireman and to put out the signals, as provided by the rules; and if the jury find from the testimony that the failure to put out the said signals contributed to the injury of the plaintiff, as proximate cause of the injury and without which it would not have happened,

then the plaintiff would be entitled to recover." We shall not go into an analysis of the charge and of the errors assigned, for the reason that there was a complete failure to show any violation of the rules by the crew of train 21, and, therefore, the requests had no application. Trains 20 and 21 were not trains delayed at stations, nor trains stopped or moving between stations; they were trains in the yard limits of the company at the city of Greenwood, and, in accordance with the requirements of the company, moving under full control. Their crews were required to be, and were, on the lookout for signals to stop. Train No. 21 was not on the main track when No. 20 entered the yard; and there was not a particle of evidence that train 20 could not be stopped without unusual jar and without any danger of collision. It is clear from the reading of the rules that they do not contemplate the using of torpedoes and fusees, and the placing of them so many telegraph poles apart within the yard limits, in the circumstances which here appeared.

The whole testimony on the part of the plaintiff shows that the injury resulted from the fact that he happened at the moment of the stop to be in such an attitude that even the ordinary jar of stopping a train going four or five miles an hour was sufficient to cause him to lose his balance. This being so, the injury, deplorable as it is, must be attributed to the risk assumed by the plaintiff when he entered upon his perilous occupation.

The judgment of this Court is that the judgment of the Circuit Court be affirmed.